**LATHAM & WATKINS LLP**
ANDREW M. GASS (SBN 259694)
Andrew.Gass@lw.com
505 Montgomery Street, Suite 2000
San Francisco, California 94111
Telephone: (415) 391-0600

SARANG VIJAY DAMLE (*pro hac vice* forthcoming)
Sy.Damle@lw.com
ELANA NIGHTINGALE DAWSON (*pro hac vice* forthcoming)
Elana.Nightingaledawson@lw.com
555 Eleventh Street, NW, Suite 1000
Washington, D.C. 20004
Telephone: (202) 637-2200

LUKE A. BUDIARDJO (*pro hac vice* forthcoming)
Luke.Budiardjo@lw.com
1271 Avenue of the Americas
New York, NY 10020
Telephone: (212) 751-4864

**MORRISON & FOERSTER LLP**
JOSEPH C. GRATZ (SBN 240676)
JGratz@mofo.com
DANIEL R. MELLO JR. (SBN 325714)
DMello@mofo.com
425 Market Street
San Francisco, California 94105-2482
Telephone: 415.268.7000 | Facsimile: 415.268.7522

Attorneys for OPENAI, INC., OPENAI GP LLC, OPENAI OPCO LLC, OPENAI GLOBAL LLC, OAI CORPORATION LLC, OPENAI GROUP PBC, and OPENAI HOLDINGS LLC

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| TED ENTERTAINMENT, INC., MATT FISHER, AND GOLFHOLICS, INC., EACH INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,<br><br>        Plaintiffs,<br>    v.<br><br>OPENAI, INC., OPENAI GP LLC, OPENAI OPCO LLC, OPENAI GLOBAL LLC, OAI CORPORATION, LLC, OPENAI GROUP PBC, AND OPENAI HOLDINGS, LLC,<br><br>        Defendants. | Case No. 5:26-cv-2935-BLF<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEFENDANT OPENAI'S NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFFS' CLASS ACTION COMPLAINT**<br><br>Judge:  Hon. Beth Labson Freeman<br>Date:  December 17, 2026<br>Time:  9:00 A.M.<br>Place:  Courtroom 1, 5th Floor<br><br>Action Filed:  April 3, 2026 |

DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' CLASS ACTION COMPLAINT
CASE NO. 5:26-cv-2935-BLF

## NOTICE OF MOTION AND MOTION

**TO ALL PARTIES HEREIN AND THEIR COUNSEL OF RECORD:**

PLEASE TAKE NOTICE that on December 17, 2026, at 9:00 a.m., before the Honorable Beth Labson Freeman in Courtroom 1, 5th Floor of the United States District Court for the Northern District of California, San Jose Division, Defendants OpenAI, Inc.; OpenAI GP LLC; OpenAI OpCo LLC; OpenAI Global LLC; OAI Corporation LLC; OpenAI Holdings LLC; and OpenAI Group PBC (collectively, "OpenAI"), by and through their counsel will, and hereby do, move this Court for an order dismissing the sole count of Plaintiffs Ted Entertainment, Inc., Matt Fisher, and Golfholics, Inc.'s ("Plaintiffs'") Class Action Complaint pursuant to Fed. R. Civ. P. 12(b)(6) with prejudice.  This motion is based on this Notice, the supporting Memorandum, and any other written or oral argument that OpenAI may present to the Court.

OpenAI's Motion to Dismiss should be granted because Plaintiffs' YouTube videos are accessible to the public through streaming.  The Digital Millennium Copyright Act only prohibits the circumvention of access controls, which prevent viewing or perceiving copyrighted works; the Act does not prohibit the circumvention of copy controls, which prevent downstream reproduction or distribution.  Because Plaintiffs allege OpenAI downloaded copies of Plaintiffs' publicly available YouTube videos without authorization, they fail to state an access-control circumvention claim.

Dated: July 27, 2026

Respectfully submitted,

MORRISON & FOERSTER LLP

By: */s/ Joseph C. Gratz*
Joseph C. Gratz

*Attorney for* OPENAI, INC., OPENAI GP LLC, OPENAI OPCO LLC, OPENAI GLOBAL LLC, OAI CORPORATION LLC, OPENAI GROUP PBC, and OPENAI HOLDINGS LLC

## TABLE OF CONTENTS

**I. INTRODUCTION** ...........................................................................................................................1

**II. BACKGROUND** ..........................................................................................................................2

    A. Plaintiffs ................................................................................................................................3

    B. Plaintiffs' Allegations About OpenAI.................................................................................3

    C. YouTube's Download-Prevention Technological Measures.................................................4

**III. THE DMCA'S ACCESS-CONTROL / COPY-CONTROL DISTINCTION** ....................7

    A. Access Controls.....................................................................................................................7

    B. Copy Controls.......................................................................................................................9

    C. The DMCA Prohibits Circumvention of Access Controls, Not Copy Controls ............10

    D. The DMCA's Legislative History Confirms the Access-Control / Copy-Control

    Distinction ...............................................................................................................................11

**IV. LEGAL STANDARD** ...............................................................................................................13

**V. ARGUMENT** .............................................................................................................................13

    A. Plaintiffs' Claims Fail Because Their Works Are Freely Accessible ...............................14

    B. Plaintiffs' Claims Fail Because They Allege Circumvention of YouTube's Copy

    Controls—Not Access Controls...............................................................................................17

        1. Rolling Cipher.............................................................................................................18

        2. IP Blocking and Rate Limiting ..................................................................................19

        3. Session-Bound, Short-Lived URLs..............................................................................21

        4. CAPTCHA Challenges ...............................................................................................21

        5. Proof of Origin Tokens ...............................................................................................23

    C. Plaintiffs Do Not Allege When YouTube's Technological Protections Were in Place When

    OpenAI Allegedly Downloaded Their Works ........................................................................23

**VI. CONCLUSION** .......................................................................................................................24

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) .................................................................................................... 10

*Baldain v. Am. Home Mortg. Serv. Inc.*,
    No. CIV S–09–0931 ................................................................................................... 19

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) .................................................................................................... 18

*Craigslist, Inc. v. Naturemarket, Inc.*,
    694 F. Supp. 2d 1039 (N.D. Cal. 2010) ..................................................................... 18

*Ets-Hokin v. Skyy Spirits, Inc.*,
    225 F.3d 1068 (9th Cir. 2000) ............................................................................... 6, 12

*In re Gilead Scis. Sec. Litig.*,
    536 F.3d 1049 (9th Cir. 2008) .................................................................................... 10

*Hattler v. Ashton*,
    No. CV16-04099 ............................................................................... 8, 9, 14, 16

*hiQ Labs, Inc. v. LinkedIn Corp.*,
    31 F.4th 1180 (9th Cir. 2022) .................................................................................... 14

*Hosseinzadeh v. Klein*,
    276 F. Supp. 3d 34 (S.D.N.Y. 2017) ........................................................................... 2

*Johnson v. Rehman*,
    No. 2:14-CV-01454-GEB-AC, 2014 WL 4986688 (E.D. Cal. Oct. 6, 2014) ........................ 19

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
    387 F.3d 522 (6th Cir. 2004) ................................................................................. 11, 12

*MDY Indus., LLC v. Blizzard Ent., Inc.*,
    629 F.3d 928 (9th Cir. 2010) ............................................................................... *passim*

*Perfect 10, Inc. v. Amazon.com, Inc.*,
    508 F.3d 1146 (9th Cir. 2007) ...................................................................................... 7

*RealNetworks, Inc. v. Streambox, Inc.*,
    No. 2:99-cv-2070, 2000 WL 127311 (W.D. Wash. Jan. 18, 2000) ................................... 7, 8

*Sullivan v. Flora, Inc.*,
    936 F.3d 562 (7th Cir. 2019) ...................................................................................... 12

*TD Ameritrade, Inc. v. Matthews*,
No. 3:16-CV-00136-SLG, 2018 WL 3451463 (D. Alaska July 16, 2018) ............................ 19

*Ted Entertainment, Inc. v. Saber*,
No. 2:25-cv-05564-WLH-PD (C.D. Cal. June 29, 2026), ECF No. 45 ..................................... 2

*Ticketmaster L.L.C. v. Prestige Entm't, Inc.*,
306 F. Supp. 3d 1164 (C.D. Cal. 2018) ............................................................................... 18

*Ticketmaster L.L.C. v. RMG Techs., Inc.*,
507 F. Supp. 2d 1096 (C.D. Cal. 2007) ............................................................................... 18

*United States v. Elcom Ltd.*,
203 F. Supp. 2d 1111 (N.D. Cal. 2002) ........................................................................... 8, 10

*Van Buren v. United States*,
593 U.S. 374 (2021) ............................................................................................................... 7

*Zixiang Li v. Kerry*,
710 F.3d 995 (9th Cir. 2013) ............................................................................................... 10

**Statutes**

17 U.S.C. § 106 ........................................................................................................................ 6

17 U.S.C. § 107 ................................................................................................................... 9, 10

17 U.S.C. § 501 ........................................................................................................................ 9

17 U.S.C. § 1201 .............................................................................................................. *passim*

**Other Authorities**

H.R. Rep. No. 105-551, pt. 1 (1998) .................................................................................. 6, 10

NII Copyright Protection Act of 1995, H.R. 2441, 104th .......................................................... 9

U.S. Copyright Office, The Digital Millennium Copyright Act of 1998 ....................................... 6

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    INTRODUCTION

Plaintiffs' sole claim under Section 1201 of the Digital Millennium Copyright Act ("DMCA") must be dismissed because none of the five technological protection measures ("TPMs") that Plaintiffs allege OpenAI circumvented actually controls access to Plaintiffs' videos.  Each TPM restricts downloading—not viewing—of the copyrighted works, which Plaintiffs have made freely available to the public on YouTube.  Because § 1201(a) prohibits only the circumvention of access controls, not copy controls, Plaintiffs fail to state a claim.

This result follows directly from the DMCA's text.  Section 1201 draws a critical distinction between two types of technological controls.  Subsection (a) addresses "access controls"—measures that control whether a user can gain access to a copyrighted work in the first instance.  Because "access" is not otherwise regulated by copyright law, § 1201(a) creates an independent cause of action for circumvention.  Subsection (b) addresses "copy controls"— measures that prevent acts such as downloading and copying that are already regulated by the Copyright Act.  Congress deliberately chose *not* to create an independent cause of action for circumventing copy controls.  This asymmetric framework was by design: because unauthorized copying may constitute fair use, prohibiting circumvention of copy controls would have effectively eliminated the fair use defense for digital works.

Plaintiffs allege that five TPMs restrict downloading or making copies of their content.  These TPMs do not block access to Plaintiffs' videos.  Plaintiffs concede that every member of the public "can watch and listen to videos" on YouTube "for free."  Class Action Complaint ("CAC") ECF 1 ¶ 35, and Plaintiffs uploaded their videos to YouTube precisely so that the public would watch them.  The alleged YouTube TPMs are, at best, copy controls, not access controls.  And more fundamentally, Plaintiffs have failed to allege that the technological measures identified in their Complaint were in place when OpenAI allegedly downloaded Plaintiffs' works.

If Plaintiffs believe the downloading of their videos was wrongful, they may bring a claim for copyright infringement.  Indeed, Plaintiffs have pursued such claims before—unsuccessfully, because the use of their videos constituted fair use.  *See, e.g.*, Min. Order Re Def's Mot. for J. on

the Pleadings, *Ted Entertainment, Inc. v. Saber*, No. 2:25-cv-05564-WLH-PD (C.D. Cal. June 29, 2026), ECF No. 45 (granting motion for judgment on the pleadings on fair use grounds). Plaintiffs have also successfully argued that their downloading of others' YouTube videos constituted fair use. *See Hosseinzadeh v. Klein*, 276 F. Supp. 3d 34 (S.D.N.Y. 2017). Plaintiffs cannot evade the fair use inquiry by recasting their claim about allegedly wrongful copying as an access-control-circumvention claim under Section 1201(a). But this is precisely the maneuver Congress anticipated and foreclosed in the structure of Section 1201. The Court should dismiss Plaintiffs' claims with prejudice.

## II.   BACKGROUND

Ted Entertainment, Inc. and the other named Plaintiffs have filed a series of complaints in four jurisdictions against eight companies offering generative artificial intelligence ("AI") products. Plaintiffs did not obtain copyright registrations for their videos and thus do not pursue copyright infringement claims. Instead, Plaintiffs assert a single claim: that defendants circumvented "access controls" on YouTube—a publicly accessible website—by downloading YouTube videos to train generative AI models, in alleged violation of Section 1201 of the DMCA, 17 U.S.C. § 1201(a).

### A.   Plaintiffs

Plaintiffs are "content creators who upload their audiovisual content to YouTube." CAC ¶ 5. That content is "intended for streaming on YouTube," *id.* ¶ 13, where the public can "watch and listen to videos for free[.]" *Id.* ¶ 35. Plaintiffs do not allege they have registered any of their YouTube videos with the U.S. Copyright Office. *See id.* ¶ 9.

Ted Entertainment, Inc. ("TEI") is a media company that operates two YouTube channels: "h3h3 Productions" and "H3 Podcast Highlights." *Id.* ¶ 15. TEI has allegedly posted "over 5,800 original videos on YouTube, with a combined total of over 4 billion views." *Id.* The Complaint alleges that 431 of TEI's videos are referenced in HD-VILA-100M and 438 in Panda-70M. *Id.*

Matt Fisher is a California resident who uploads golf videos to YouTube. *Id.* ¶ 18. His videos allegedly have hundreds of millions of views, and his channel has over 500,000

subscribers. *Id.* The Complaint alleges that two of his video URLs appear in HD-VILA-100M and eight of his videos are referenced in Panda-70M. *Id.*

Golfholics, Inc., a California corporation, publishes golf videos on YouTube. *Id.* ¶ 20. Golfholics' videos allegedly have millions of views. *Id.* The Complaint alleges that 62 of its videos are referenced in HD-VILA-100M and Panda-70M. *Id.*

**B.     Plaintiffs' Allegations About OpenAI**

Plaintiffs allege that OpenAI offered Sora, a now-deprecated text-to-video generative AI model that takes as input text prompts and outputs video clips. *Id.* ¶ 66. Plaintiffs allege that OpenAI accessed, scraped, and downloaded some of Plaintiffs' videos from YouTube in order to train Sora. *See, e.g.*, *id.* ¶ 84 (alleging OpenAI "scrape[d] audiovisual content from YouTube" to train its generative AI model); ¶ 94 (alleging "[b]ulk extraction of YouTube videos"); ¶ 96 (alleging OpenAI "intentionally accessed large volumes of YouTube videos by scraping and/or using tools and workflows that bypass or evade YouTube's TPMs and usage restrictions . . . to assemble training corpora for Defendant's AI models and services"); ¶ 106 (alleging OpenAI used tools to extract a "sheer volume of videos necessary to train Sora"). Plaintiffs also acknowledge that, like all YouTube users, they authorized OpenAI to access their videos. *Id.* ¶ 37 ("[C]ontent creators such as Plaintiffs who upload content onto YouTube grant a license to YouTube for certain uses as well as to other users of YouTube to access content through YouTube's services[.]").

Plaintiffs allege that OpenAI downloaded video files from YouTube based on four reference lists, each containing millions of videos. *See id.* ¶¶ 68–72 (identifying the HD-VILA-100M, HD-VG-130M, Panda-70M, and HowTo100M datasets). Plaintiffs allege that the datasets contain only "references and location identifiers pointing to" YouTube videos, so users must "access and download the referenced videos directly from YouTube." *Id.* ¶ 68. Plaintiffs allege that OpenAI used these videos to train Sora. *Id.* ¶ 72.

**C.     YouTube's Download-Prevention Technological Measures**

Plaintiffs allege that YouTube employs five technological measures to prevent unauthorized downloads: (1) "rolling cipher," (2) "IP-based blocking and rate limiting," (3)

"short-lived, session bound streaming URLs," (4) "CAPTCHA human verification challenges," and (5) "proof-of-origin tokens." *Id.* ¶ 49.  None of these measures is alleged to control whether a user can view or stream Plaintiffs' videos.  Each measure operates only to restrict **downloading**—the acquisition of a permanent copy of the underlying video file.

**Rolling Cipher.**  The rolling cipher is allegedly a "complex and periodically changing algorithm" that "impedes an ordinary user from creating a permanent, unrestricted download of audiovisual content made available on YouTube only for streaming and restricted downloading." *Id.* ¶ 51.  This measure is not alleged to prevent a user from watching a video in the ordinary course of YouTube's operation; rather, it allegedly hides the URL of the underlying video file. *Id.*  Plaintiffs allege YouTube maintains two URLs for each video: one for the web page on which the video plays, and another for the underlying video file. *Id.*  The rolling cipher does not restrict access to the webpage URL; it applies only to the URL for the underlying video file. *Id.* ¶¶ 50–51.

**IP Blocking and Rate Limiting.**  Plaintiffs allege that YouTube's IP blocking and rate limiting is triggered only when YouTube detects "excessive or abusive request patterns." *Id.* ¶ 53.  YouTube allegedly monitors the number and frequency of requests from IP addresses, and once an "abnormal volume" is reached, it prevents that IP address from retrieving audiovisual content. *Id.* ¶ 54–55.  This measure operates only in response to "excessive or abusive" activity, not as a precondition to viewing any video.

**Session-Bound Streaming URLs.**  Plaintiffs allege that YouTube issues "temporary, cryptographically signed" URLs with "authorization parameters such as expiration timestamps and client identifiers." *Id.* ¶ 57.  These session-bound, short-lived URLs "limit[] when and from where [YouTube's] file may be requested." *Id.*  After the session has expired, the server will not deliver the video file. *Id.*  This measure prevents a video file from being downloaded outside of YouTube's standard playback environment. *Id.*

**CAPTCHA.**  Plaintiffs allege that "[w]hen traffic patterns indicate automated or suspicious activity, YouTube may require completion of a CAPTCHA challenge before allowing further requests to proceed." *Id.* ¶ 59.  This measure is not alleged to stand between any user and

the ability to watch a video in the ordinary course; it is triggered only by patterns of automated or bulk download activity.

**Proof of Origin Tokens.** Plaintiffs allege that YouTube "require[s] that requests for video segments include cryptographic tokens demonstrating that the request originates from an authorized client environment operating within the intended playback context." *Id.* ¶ 61. YouTube's proof-of-origin tokens are generated during playback and validated before data is delivered. *Id.* YouTube will not deliver the audiovisual file without a successfully validated token. *Id.* This measure prevents a video file from being downloaded outside of YouTube's standard playback environment. *Id.*

* * *

Plaintiffs allege that the above measures are "technological processes and tools to detect and block access to files **for unauthorized downloading**." *Id.* ¶ 46 (emphasis added). Plaintiffs' allegations focus on the downloading of videos. *Id.* ¶ 142 (asserting OpenAI's "circumvention tools" obtained access "to the underlying file," thereby "triggering liability under § 1201"); ¶ 40 ("scraping or bulk downloading is not merely copying . . . it is an act of unauthorized access"); ¶ 97 (alleging OpenAI "accessed the underlying audio and video files and downloaded those files"); ¶ 141 (alleging that by "circumventing YouTube's technological barriers that effectively control access to extracted files . . . Defendant improperly obtained millions of videos from YouTube's platform"). In particular, Plaintiffs allege that OpenAI used yt-dlp, an open-source program that "replicat[es] . . . the signature-transformation process that YouTube uses to protect its media URLs" to "retrieve the underlying video and audio files directly from YouTube's servers." *Id.* ¶ 99–100 (alleging yt-dlp "circumvent[s] the access controls YouTube uses to prevent unauthorized downloading"). Plaintiffs allege that OpenAI should not have been able to download permanent copies of the underlying digital files using yt-dlp or similar tools. *Id.* ¶ 142 (distinguishing "viewing a YouTube video through YouTube's authorized and advertising-supported playback mechanisms" from obtaining "access to the underlying file"); *see also id.* ¶ 39 (distinguishing "[s]treaming through YouTube and downloading permanent copies").

Plaintiffs allege that a user may lose the ability to stream or download if YouTube's system detects automated or mass downloads. *See, e.g.*, *id.* ¶¶ 53, 57. Plaintiffs do not allege that any technological measure controls whether members of the public can view or stream the videos in the first instance or in the ordinary course of YouTube's operation. *See, e.g.*, *id.* ¶¶ 51, 53, 57, 59, 61. Correspondingly, Plaintiffs do not base their claim on OpenAI accessing their videos by watching them, which they acknowledge anyone, including OpenAI, can do. *Id.* ¶ 142.

## III. THE DMCA'S ACCESS-CONTROL / COPY-CONTROL DISTINCTION

The Copyright Act grants copyright holders exclusive rights to control certain uses of their works, such as reproduction, distribution, and performance. 17 U.S.C. § 106. The DMCA supplements these protections by safeguarding the technological measures copyright owners use to protect their works. *Id.* § 1201; *see also* U.S. Copyright Office, The Digital Millennium Copyright Act of 1998: U.S. Copyright Office Summary ("1998 USCO DMCA Summary") 3–4, *available at* https://www.copyright.gov/legislation/dmca.pdf. The DMCA provides different protections depending on whether the technological measure is an "access control" or a "copy control." The distinction between the two is central to this motion.

### A. Access Controls

Under the DMCA, an access control is "a technological measure" that "in the ordinary course of its operation, requires the application of information, or a process or a treatment, with the authority of the copyright owner, to gain access to the work." 17 U.S.C. § 1201(a)(3)(B). Because these measures must be satisfied "to **gain** access to the work"—that is, to access it in the first instance—Section 1201(a) "does not apply to the subsequent actions of a person once he or she has obtained authorized access to a copy of a work . . . even if such actions involve circumvention of additional forms of technological protection measures." H.R. Rep. No. 105-551, pt. 1, at 18 (1998) (emphasis added).

The statute requires that an access control must control access to "the work," not to any particular file embodying the work, and not just one out of several available forms of access to the work. "The work" is the expressive content itself—not a particular digital file in which the work is embodied. *Ets-Hokin v. Skyy Spirits, Inc.*, 225 F.3d 1068, 1079 (9th Cir. 2000) ("the term

'work' or 'works' is used throughout the Copyright Act to refer to the 'subject matter' that the act is designed to protect: 'original works of authorship'"); *see Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1160 (9th Cir. 2007) ("[a] photographic image is a work," while "[t]he image stored in the computer is the 'copy' of the work"). Here, the "works" at issue are the actual video content itself, not the digital files in which that content is embodied. *See* CAC ¶ 38.

"[P]assword requirement[s] limiting access to a website to paying customers" and "authentication codes" are classic examples of access controls. U.S. Copyright Office, Section 1201 of Title 17: A Report of the Register of Copyrights 6 (2017). Congress identified additional examples: An "encrypted" DVD cannot be watched at all until "decrypt[ed]," and a "scrambled" cable TV signal cannot be watched at all until "descramble[d]." *Id.*; *see also* 17 U.S.C. § 1201(a)(3)(A). These examples illustrate that "access" is a "gates-up-or-down inquiry"; a user either has or does not have access to a work. *See MDY Indus., LLC v. Blizzard Ent., Inc.*, 629 F.3d 928, 952–53 (9th Cir. 2010) (citing *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 387 F.3d 522, 547 (6th Cir. 2004)) ("Just as one would not say that a lock on the back door of a house 'controls access' to a house whose front door does not contain a lock and just as one would not say that a lock on any door of a house 'controls access' to the house after its purchaser receives the key to the lock, it does not make sense to say that this provision of the DMCA applies to otherwise-readily-accessible copyrighted works."); *see also Van Buren v. United States*, 593 U.S. 374, 390 (2021) (interpreting "access" under the analogous Computer Fraud and Abuse Act). This "gates-up-or-down" framework is the touchstone of the access-control inquiry: a technological measure qualifies as an access control only if it actually prevents a user from perceiving the copyrighted expression. *RealNetworks, Inc. v. Streambox, Inc.*, No. 2:99-cv-2070, 2000 WL 127311, at *2, *7 (W.D. Wash. Jan. 18, 2000) (finding an "authentication sequence which only RealServers and RealPlayers know" to be an access control because without the sequence, the server "does not stream the content it holds").

### B.   Copy Controls

In contrast, a copy control is "a technological measure" that "in the ordinary course of its operation, prevents, restricts, or otherwise limits the exercise of a right of a copyright owner

under this title." 17 U.S.C. § 1201(b)(2)(B).  This includes the right of "reproduction" or copying.  *Id.* § 106(1); *see also* 1998 USCO DMCA Summary at 4 (describing a copy control as a "technological measure that prevents copying").

The court in *Hattler v. Ashton*, No. CV16-04099 JAK(KSx), 2017 WL 11634742, at *6 (C.D. Cal. Apr. 20, 2017), held that copy controls "allow some forms of 'access' but restrict other uses of the copyrighted work."  The plaintiff had posted his videos to the video-sharing site Vimeo.  *Id.* at *1.  He alleged that the defendant used portions of those videos in live concert performances and online marketing in violation of § 1201(a).  *Id.* at *1, *5.  Hattler's claim centered on the allegation that defendants "downloaded the Works in a manner that circumvented the technological protections on the websites where the Works were available for streaming."  *Id.* at *5.  The defendants responded that those protections "restricted downloading, but not general access."  *Id.*

The court agreed with the defendants.  It held that the relevant statutory question was whether the measure actually controlled access to the copyrighted work, as opposed to granting some form of access (such as viewing) while restricting copying.  *Id.* at *5–6.  Section 1201(b), not 1201(a), addresses measures "that allow some forms of 'access' but restrict other uses of the copyrighted work."  *Id.* at *6 (quoting *Lexmark*, 387 F.3d at 545).  Making media available only for streaming and not for download is a copy control because it "permits users to view or watch a copyrighted work but prevents them from downloading a permanent copy of the work." *Id.* (quoting *Lexmark*, 387 F.3d at 545).

### C.    The DMCA Prohibits Circumvention of Access Controls, Not Copy Controls

Section 1201 treats access controls and copy controls differently.  *MDY Indus.*, 629 F.3d at 944.  Congress has banned both "circumventing access controls" and "trafficking in and marketing of devices that are primarily designed for such circumvention."  *United States v. Elcom Ltd.*, 203 F. Supp. 2d 1111, 1119-20 (N.D. Cal. 2002).  Section 1201(a)(1), the act-of-circumvention prohibition, provides that "[n]o person shall circumvent a technological measure that effectively controls access to a work protected under this title."  17 U.S.C. § 1201(a)(1)(A).  Section 1201(a)(2), the anti-trafficking provision, prohibits the manufacture or sale of "any

technology, product, service, device, component, or part thereof" that is "primarily designed or produced for the purpose of circumventing" an access control. *Id.* § 1201(a)(2).

Congress chose to treat copy controls differently. Section 1201(b) bans trafficking in tools primarily designed for circumvention. *Id.* § 1201(b). But it does not prohibit *circumventing* a copy control. Because "copyright law has long forbidden copyright infringement," the natural result of circumventing a copy control, "no new prohibition was necessary." *MDY Indus.*, 629 F.3d at 945 (citation omitted). Any claim alleging circumvention of a copy control is properly brought (if at all) as a copyright infringement claim under the Copyright Act, *see* 17 U.S.C. § 501, subject to its various requirements. Those requirements include registration, *see id.* § 411(a), and deposit copies, *see id.* § 407. Critically, the Copyright Act provides affirmative defenses, including the fair use defense. *See id.* § 107; *see also id.* § 1201(c)(1) ("Nothing in this section shall affect . . . defenses to copyright infringement, including fair use").

In sum, under this statutory scheme, § 1201(a)(1)'s prohibition on circumventing access controls narrowly applies to technological measures restricting access to a copyrighted work, but does not apply to measures that "permit access to copyrighted work, but restrict copying." *Hattler*, 2017 WL 11634742, at *8 (granting motion to dismiss § 1201(a) claim based on downloading works available for streaming).

## D.    The DMCA's Legislative History Confirms the Access-Control / Copy-Control Distinction

The legislative history reinforces that Section 1201(a) covers only technological measures controlling access. Congress deliberately designed this asymmetry to prevent the DMCA from becoming a backdoor around fair use.

When Congress first considered anti-circumvention legislation in 1995, *see* NII Copyright Protection Act of 1995, H.R. 2441, 104th Cong. § 1201 (1995), industry representatives warned that a broad prohibition on circumventing copy controls would "impede 'legal' copying" in the form of fair use. NII Copyright Protection Act of 1995: Hearing on H.R. 2441 and S. 1284 Before the Subcomm. on Cts. & Intell. Prop., pt. 2, 104th Cong. at 149 (1996); *see also* Jessica D. Litman, Digital Copyright 131-32 (2d ed. 2006), *available at*

DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' CLASS ACTION COMPLAINT                    9
CASE NO. 5:26-cv-2935-BLF

https://repository.law.umich.edu/cgi/viewcontent.cgi?article=1000&context=books.  Congress agreed, and to protect "the continued ability to make fair use of copyrighted works," distinguished between access controls and copy controls.  1998 USCO DMCA Summary at 4.  Because "copying of a work may be a fair use under appropriate circumstances," the statute "does not prohibit the act of circumventing a [copy control]."  *Id.*  Congress codified this principle in the DMCA itself, providing that "[n]othing in this section shall affect rights, remedies, limitations, or defenses to copyright infringement, including fair use, under this title."  17 U.S.C. § 1201(c)(1).

The justification for this distinction is straightforward: a copyright owner has the right to decide whether, and to whom, to make her work accessible.  Litman, *supra*, at 133–34.  But once a copyright owner has made a work accessible to the public, whether others may copy it is governed by the Copyright Act, including fair use.  *See* 17 U.S.C. § 107; *see also Elcom*, 203 F. Supp. 2d at 1120–21 (fair use "allow[s] a certain amount of direct copying for certain uses, without the permission of the copyright owner and notwithstanding the copyright owner's exclusive rights").  "Congress expressly disclaimed any intent to impair any person's rights of fair use."  *Id.*; *see also* H.R. Rep. No. 105-551, pt. 1, at 19 (1998).

## IV.    LEGAL STANDARD

To survive a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  Dismissal is warranted where "[a] complaint either (1) lacks a cognizable legal theory or (2) fails to allege sufficient facts to support a cognizable legal theory."  *Zixiang Li v. Kerry*, 710 F.3d 995, 999 (9th Cir. 2013).  In evaluating the sufficiency of a pleading, a court need not accept as true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences."  *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (internal citations omitted).  Allegations merely "consistent with" liability, or where "more likely explanations" exist, are insufficient.  *Iqbal*, 556 U.S. at 681.

## V.    ARGUMENT

Plaintiffs fail to identify "a technological measure that effectively controls access to a work protected under this title" as required to state a claim under Section 1201(a).  17 U.S.C. § 1201(a)(1)(A).  Section 1201(a)'s text, structure, and legislative history confirm that the technological measure must control users' ability "to gain access to [a] work."  *Id.* § 1201(a)(3)(B).  A technological measure that only controls usage of a work after access has been gained—such as one that restricts downloading or copying—is not an access control.  *Id.*

For a technological measure to qualify as an access control, a user must encounter and satisfy that measure to perceive the copyrighted expression.  *See MDY Indus.*, 629 F.3d at 952 ("Since a player need not encounter Warden to access WoW's individual non-literal elements, Warden does not effectively control access to those elements.").  A technological measure does not "effectively" control access to a work if it leaves the work available to the public.  *Lexmark*, 387 F.3d at 547 (finding § 1201(a)(2) "does not naturally extend to a technological measure that restricts one form of access but leaves another route wide open").

### A.    Plaintiffs' Claims Fail Because Their Works Are Freely Accessible

Plaintiffs' concession that all YouTube users "can watch and listen to videos" on YouTube "for free" is dispositive: there are no access controls in place.  CAC ¶ 35.  Plaintiffs do not allege that users encounter any technological measure before they can perceive the works, such as a password or paywall.  They assert only that viewing occurs through "YouTube's authorized playback mechanism" and "controlled streaming."  *Id.* ¶¶ 3, 35.  Under the "gates-up-or-down" framework, the gate is up: Plaintiffs' works are freely accessible to everyone.  A TPM does not effectively control access where it restricts one form of access but leaves another route unobstructed.  *MDY Indus.*, 629 F.3d at 952-53; *Lexmark*, 387 F.3d at 546-47.  A TPM need not be circumvention-proof, but a TPM that protects only one route for accessing a work while leaving open another (for example, accessing the work directly at its storage location, as in *MDY*) does not effectively control access to the work.

Section 1201(a)(1) defines an access control as a TPM that "controls access to a work." 17 U.S.C. § 1201(a)(1)(A); *see also id.* § 1201(a)(3)(B) (to "'effectively control[] access to a

work'" is to "require[] the application of information … to gain access to the work"). In copyright law, the term "work" refers to the "original expression . . . entitled to protection." *Sullivan v. Flora, Inc.*, 936 F.3d 562, 567-68 (7th Cir. 2019); *see also Ets-Hokin*, 225 F.3d at 1079 ("[T]he term 'work' or 'works' is used throughout the Copyright Act to refer to the 'subject matter' that the act is designed to protect: 'original works of authorship.'"). If the copyrighted expression is available without circumventing the TPM, then the TPM does not "control[] access to [the] work." 17 U.S.C. § 1201(a)(1)(A). Here, Plaintiffs allege, at most, that YouTube has TPMs that present a barrier to parties seeking to download specific files containing "copies of" Plaintiffs' works. CAC ¶¶ 51, 94. And they allege, at most, that OpenAI circumvented these TPMs by "retriev[ing] permanent copies of content that YouTube makes available only for streaming." *Id.* ¶ 94. But Plaintiffs' alleged TPMs do not restrict or otherwise control users' ability to "gain access to the work" in the first place. 17 U.S.C. § 1201(a)(3)(B). As Plaintiffs themselves acknowledge, YouTube's TPMs are not access controls but copy controls.

The seminal cases *Lexmark International, Inc. v. Static Control Components, Inc.*, 387 F.3d 522 (6th Cir. 2004), and *MDY Industries, LLC v. Blizzard Entertainment, Inc.*, 629 F.3d 928 (9th Cir. 2010), confirm that § 1201(a) draws this distinction. In *Lexmark*, the defendant was accused of circumventing an authentication sequence that enabled a toner cartridge to function in a printer only if it was authorized by the printer's manufacturer. 387 F.3d at 546-47. The plaintiff alleged that the authentication sequence effectively controlled access to the software that ran inside the printer because the software would only permit printing upon successful completion of the authentication sequence. *Id.* But the literal code for the authentication software inside the printer could be accessed with or without the authentication sequence. *Id.* The Sixth Circuit held that the authentication sequence was not a measure that effectively controlled access to the software. While the authentication sequence "prevent[ed] the printer from functioning," it did not block access to the copyrighted software. *Id.* at 547. As a result, it did not "effectively control[] access" under § 1201(a). *Id.*

The Ninth Circuit applied this analysis in *MDY*. The defendant in *MDY* was the creator of the "multiplayer online role-playing game," World of Warcraft ("WoW"). 629 F.3d at 934-36.

The plaintiff developed and sold the software program Glider, which automates completion of the early levels of WoW. *Id.* Plaintiff moved to dismiss the defendant's counterclaim that Glider circumvented Warden, defendant's technology preventing players using unauthorized software, including bots, from accessing WoW servers. *Id.* at 935, 942-43. On appeal, the Ninth Circuit separated WoW's works at issue into (1) "literal elements;" (2) "individual non-literal elements," and (3) "dynamic non-literal elements," or "the 'real-time experience' of playing WoW." *Id.* at 942-43. The Ninth Circuit held that Warden did not control access to works (1) and (2). *Id.* at 952. The "game client's software code" was "available on a player's hard drive once the game client software is installed," and the "individual nonliteral components may be accessed by a user without signing on to the server." *Id.* Warden "le[ft] open the ability to access these elements directly via the user's computer." *Id.* at 953. Warden only qualified as an access control for work (3) because users could not access those elements without applying a particular technological access-control process on the plaintiff's server. *Id.* at 954. *MDY* therefore adopted *Lexmark*'s distinction between (1) measures that control gaining access to a work in the first instance and (2) measures that merely control one of several routes for accessing a work.

Plaintiffs' YouTube videos are available to anyone who visits each video's YouTube web page, CAC ¶ 35, just as WoW's literal code could be read from the user's hard drive, *MDY Indus.*, 629 F.3d at 952. Measures making it harder to access those same videos by another route do not constitute an access control.

Plaintiffs allege that by uploading these videos and agreeing to YouTube's terms of service, they intended to freely give the public access to their audiovisual works on the YouTube platform. CAC ¶ 13 (Plaintiffs' content is "intended for streaming on YouTube"); ¶ 34 (Plaintiffs "uploaded" the content at issue "onto YouTube's video sharing platform"); ¶ 37 (under YouTube's Terms of Service, Plaintiffs granted a license "to other users of YouTube to access content through YouTube's services"). Plaintiffs derive value from their works by allowing others to freely stream them. CAC ¶¶ 16, 19, 21, 39. This free access has garnered Plaintiffs "over 4 billion views." *Id.* ¶ 15; *see also id.* ¶ 18 ("hundreds of millions of views"), ¶ 20 ("millions of views").

Plaintiffs' concession that the videos are publicly accessible is inconsistent with their claim that OpenAI circumvented an access control.  *See hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1199 (9th Cir. 2022) ("a defining feature of public websites is that their publicly available sections lack limitations on access; instead, those sections are open to anyone with a web browser"); *MDY Indus., LLC*, 629 F.3d at 945–46 ("imput[ing]" the "lack of symmetry" between §§ 1201(a) and (b) "to Congress' need to balance copyright owners' new anti-circumvention right with the public's right to access the work.").

**B.      Plaintiffs' Claims Fail Because They Allege Circumvention of YouTube's Copy Controls—Not Access Controls**

By targeting OpenAI's alleged downloading of their works, Plaintiffs allege circumvention of copy controls, not access controls.  *See* CAC ¶ 43 ("To enforce its prohibitions on downloading content, YouTube does not provide a downloading option that is readily available to users."), ¶ 44 (discussing limitations to YouTube's "'download' option," including that "the audiovisual files cannot be transferred to any other device, but remain only for streaming on the app"), ¶ 8 (alleging Plaintiffs' works have been "unlawfully *copied*") (emphasis added).

Plaintiffs do not allege any technology that requires the application of information, or a process, or treatment to watch their videos.  Instead, Plaintiffs allege OpenAI circumvented five technological measures that YouTube "deploy[ed] . . . to deter direct **downloading** or bulk extraction."  CAC ¶ 49 (emphasis added); *see also* ¶ 46 (alleging YouTube uses these "technological processes and tools . . . [to] enforce its prohibitions on **downloading** content") (emphasis added).  By targeting OpenAI's alleged efforts to download videos, Plaintiffs allege the very fact pattern courts have carved out of § 1201(a)(1): access permitted but copying restricted.

To be sure, under *MDY*, a TPM can serve as both a § 1201(a) access control and a § 1201(b) copy control "if a copyright owner puts in place an effective measure that both (1) controls access and (2) protects against copyright infringement."  629 F.3d at 946-47.  But if the measure "does nothing to prevent access to the plain text of the work," § 1201(a) does not apply.  *Id.*  And *Hattler* confirmed that "streaming media [that] permits users to view or watch a copyrighted work but prevents them from downloading a permanent copy of the work" functions

only as a copy control.  2017 WL 11634742, at \*7 (quoting *Lexmark*, 387 F.3d at 545).  Plaintiffs' five alleged TPMs fall squarely within that category.

### 1.    Rolling Cipher

The rolling cipher is not an access control because it does not prevent users from watching a YouTube video.  Plaintiffs allege that YouTube "maintains two different URLs for any given video: the page URL, visible to the user, is for the webpage where the video playback occurs, and the file URL, not visible to the user, is for the video file itself that is played within the page."  CAC ¶ 51.  The file URL is encrypted using the rolling cipher, which "withhold[s] a usable file location unless the requesting client can transform an obfuscated signature parameter[.]"  *Id.* ¶¶ 50, 51, 99.  But these two URLs correspond to the same video.  When a user visits the page URL to stream the work, the web page instructs the user's browser to access the file URL and show the video on the web page.  *Id.*  The user's browser receives all the information needed to stream the file.  An "ordinary user," *id.* ¶ 51, may simply view the web page as rendered without examining the publicly available computer code.  But sophisticated users of an ordinary web browser can obtain the URL for the underlying file regardless of the rolling cipher.  Nothing in the DMCA suggests that access instructions embedded in publicly available computer code qualify as "a technological measure that effectively controls access to a work."  17 U.S.C. § 1201(a)(1)(A).  That is especially true here, where YouTube is designed to make videos freely accessible to anyone who wants to view them.

Additionally, Plaintiffs' own allegations confirm that the rolling cipher is a copy control, not an access control.  Plaintiffs concede that the rolling cipher "impedes an ordinary user from creating a permanent, unrestricted download of audiovisual content[.]"  CAC ¶ 51; *see also id.* ¶ 99 (alleging the rolling cipher "protects the true media file URL").  They do not allege that the rolling cipher restricts users from accessing—that is, viewing or streaming—the video.  YouTube has left open the ability to access the work directly, *see MDY Indus.*, 629 F.3d at 954, and the rolling cipher therefore does not qualify as an access control.

With respect to streaming, Plaintiffs allege only that YouTube users receive a "scrambled signature . . . processed to produce a valid media request URL."  CAC ¶ 50.  But the web page

includes all required software for the video to play automatically. Users visiting YouTube still experience a continuous "stream" of content. *Id.* ¶¶ 38, 73. Because Plaintiffs' alleged rolling cipher is a copy control, not an access control, OpenAI's alleged circumvention does not violate § 1201(a).

### 2. IP Blocking and Rate Limiting

YouTube's "IP blocking and rate limiting," CAC ¶ 53, is not an access control. Plaintiffs allege that users who make too many requests will be IP blocked or rate limited. *Id.* ¶ 53; *id.* ¶¶ 54-55. Plaintiffs concede this measure targets download activity. *See id.* ¶ 46 ("YouTube monitors downloading activity and may block IP addresses that make too many download attempts in a specified period."). Because neither IP blocking nor rate limiting prevent the public from accessing these works in the first instance, they are copy controls, not access controls. *See Hattler*, 2017 WL 11634742, at *7-8 (finding no circumvention of an access control when the works "were accessible for viewing to the general public"). Even to the extent these measures may, as a secondary consequence, incidentally prevent a blocked address from *streaming* content, they do not control the public's ability to access the works. The works remain freely available to every other user—and to the blocked user from any other IP address.

The Copyright Office has concluded that "rate limit enforcement systems do not effectively control access to a work as contemplated by section 1201." Register of Copyrights, Section 1201 Rulemaking: Ninth Triennial Proceeding to Determine Exemptions to the Prohibition of Circumvention ("Section 1201 Rulemaking Rep.") 125 (2024), *available at* https://www.copyright.gov/1201/2024/2024_Section_1201_Registers_Recommendation.pdf. The National Telecommunications and Information Administration ("NTIA") has agreed, noting that rate limits "'do[] not prevent someone from accessing the computer programs' and only 'become effective' after a user already is in possession or has lawfully accessed" the work. *Id.* at 133-34. These systems "do not require 'the application of information, or a process or a treatment'" but instead "require that users refrain from [certain] conduct" like downloading. *Id.* at 125. And "IP address rotation" does not constitute "circumvention of an effective control" because users may

still "access[] . . . the plaintiff's web service via other servers and internet service providers[.]" *Id.*

### 3.    Session-Bound, Short-Lived URLs

Plaintiffs have not alleged that OpenAI circumvented any access control in the form of session-bound, short-lived URLs.  Plaintiffs allege that YouTube provides URLs that are "tied to a particular playback session and client context," such that "session-bound URLs expire automatically."  CAC ¶¶ 57-58.  This technological measure prevents a potential video downloader from "rely[ing] on a static link."  *Id.* ¶ 58.  Plaintiffs assert that "these URLs expire and cannot be reused," *id.* ¶ 108, but they have not alleged that OpenAI could not access or view the work before its expiration.  Plaintiffs acknowledge that these URLs do not affect the experience of ordinary playback.  *Id.* ¶ 58.  These URLs are thus not access controls.

The Copyright Office has concluded that using valid credentials to access authentication-protected content does not constitute circumvention.  Section 1201 Rulemaking Rep. at 123 ("using valid access credentials, even without authorization, does not constitute circumvention under section 1201." (internal italics omitted)).  Plaintiffs allege that OpenAI "programmatically renew[ed] expired credentials and initiat[ed] new authorized sessions[.]"  CAC ¶ 58.  But so long as the credentials remained "valid," "supplying [them] does not avoid or bypass an authentication system in its 'gatekeeping capacity.'"  Section 1201 Rulemaking Rep. at 124.  Plaintiffs accuse OpenAI only of creating new *valid* credentials to continue accessing YouTube.  CAC ¶ 58.  By Plaintiffs' own allegations, OpenAI's YouTube sessions remained "authorized."  *Id.*

### 4.    CAPTCHA Challenges

Plaintiffs' CAPTCHA allegations likewise fail to plead an access control.  Plaintiffs assert that "[w]hen traffic patterns indicate automated or suspicious activity, YouTube may require completion of a CAPTCHA challenge before allowing further requests to proceed."  CAC ¶ 59.  Critically, CAPTCHAs are triggered only by "automated or suspicious" activity—not as a precondition to viewing any video.  *Id.*  OpenAI had free access to the works prior to any "automated or suspicious" activity, and the public's access is never conditioned on solving a

CAPTCHA.  The CAPTCHA challenges do not block the public's access to the works in the ordinary course of YouTube's operation.

The Copyright Office's analysis of rate limit enforcement systems, Section 1201 Rulemaking Rep. at 125, applies equally here.  Plaintiffs allege that OpenAI "configured" its systems to "evade detection, distribute requests across multiple machines, or otherwise prevent CAPTCHA enforcement from halting access."  CAC ¶ 60.  But the Copyright Office has concluded that "employing backoff techniques," which "introduc[e] successively greater delays between . . . API calls" to avoid triggering rate limiting measures like CAPTCHAs, does not constitute "avoiding or disabling . . . rate limit systems" but rather is an attempt to "stay within the limits by introducing delays."  Section 1201 Rulemaking Rep. at 124–25.

Some courts have held that CAPTCHAs can be § 1201 access controls—but *only* where a CAPTCHA controlled *all* access to the material.  *See Craigslist, Inc. v. Naturemarket, Inc.*, 694 F. Supp. 2d 1039, 1048 (N.D. Cal. 2010) (CAPTCHA presented every time a user generated an account or ad); *Ticketmaster L.L.C. v. RMG Techs., Inc.*, 507 F. Supp. 2d 1096, 1112 (C.D. Cal. 2007) (CAPTCHA presented every time "the user makes a ticket request on ticketmaster.com"); *Ticketmaster L.L.C. v. Prestige Entm't, Inc.*, 306 F. Supp. 3d 1164, 1174 (C.D. Cal. 2018) (same). Here, any member of the public can access the material without solving a CAPTCHA. Plaintiffs allege users who make many requests receive CAPTCHAs as a means of limiting the rate of those requests.  CAC ¶ 59.  The allegations describe a rate limit, not an access control.

Separately, Plaintiffs do not allege that any CAPTCHA challenge was actually presented with respect to any of Plaintiffs' specific works.  Instead, Plaintiffs allege that "[l]arge-scale scraping operations necessarily generate request patterns that would ordinarily trigger . . . human-verification challenges."  *Id.* ¶ 60; see also *id.* ¶ 109 ("At scale, Defendant's automated activity would also trigger . . . CAPTCHA challenges[.]").  These speculative allegations are insufficient. *Twombly*, 550 U.S. at 555 ("[f]actual allegations must be enough to raise a right to relief above the speculative level").

### 5.    Proof of Origin Tokens

Plaintiffs' allegations with respect to "proof-of-origin tokens" fail because these tokens do not limit or otherwise affect a user's ability to watch videos on YouTube.  CAC ¶ 61.  Plaintiffs allege that these tokens "restrict[] access" because they require video requests to "include cryptographic tokens demonstrating that the request originates from an authorized client environment operating within the intended playback context."  *Id.*  What Plaintiffs label YouTube's "authorized playback environment," *id.* ¶ 110, is merely the YouTube web page preloaded with everything a user's browser needs to play the video.  A user need not do anything—much less apply any information, process, or treatment—to watch a video on YouTube's platform.  *Id.* ¶ 61.  These tokens are not access controls.

### C.    Plaintiffs Do Not Allege That YouTube's Technological Protections Were in Place When OpenAI Allegedly Downloaded Their Works

The complaint must also "provide some notice as to when the challenged conduct allegedly occurred" sufficient to "put[] defendant 'on notice of the time frame in question.'" *Baldain v. Am. Home Mortg. Serv. Inc.*, No. CIV S–09–0931 LKK/GGH, 2010 WL 56143, at *5 (E.D. Cal. Jan. 5, 2010) (citation omitted); *see also Johnson v. Rehman*, No. 2:14-CV-01454-GEB-AC, 2014 WL 4986688, at *2 (E.D. Cal. Oct. 6, 2014).  Under the DMCA, a plaintiff must plead the technological measures in place at the time of the alleged circumvention.  *See TD Ameritrade, Inc. v. Matthews*, No. 3:16-CV-00136-SLG, 2018 WL 3451463, at *6 (D. Alaska July 16, 2018) (dismissing § 1201(a) claim where plaintiff "fail[ed] to specifically allege what technological measure(s), if any, [defendant] had on his hard drive," and which thus applied, "at the time of the alleged cyber attack").

Here, while Plaintiffs have described five technological measures, they have not alleged when YouTube implemented any of them, let alone whether they were in place when OpenAI allegedly downloaded the videos.  This failure independently warrants dismissal.

## VI.    CONCLUSION

Plaintiffs have failed to plead circumvention of a technological measure controlling access to their works, which they have made publicly available for free on YouTube.  Plaintiffs'

allegations instead target unauthorized downloading, which is not prohibited under § 1201(a)(1)(A).  Permitting such claims to proceed under the DMCA's anti-circumvention provision would disrupt the balance between protection and expression that Congress carefully crafted.

For the foregoing reasons, the Complaint should be dismissed with prejudice in its entirety for failure to state a claim.

Dated:  July 27, 2026

Respectfully submitted,

MORRISON & FOERSTER LLP

By: */s/ Joseph C. Gratz*
JOSEPH C. GRATZ

LATHAM & WATKINS LLP

By: */s/ Andrew M. Gass*
ANDREW M. GASS

*Attorneys for* OPENAI, INC., OPENAI GP LLC, OPENAI OPCO LLC, OPENAI GLOBAL LLC, OAI CORPORATION LLC, OPENAI GROUP PBC, and OPENAI HOLDINGS LLC

## CERTIFICATE OF SERVICE

On July 27, 2026, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all persons registered for ECF.  All copies of documents required to be served by Fed. R. Civ. P. 5(a) and L.R. 5-1 have been so served.

/s/ Joseph C. Gratz

Joseph C. Gratz